UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JUDITH DEWALT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CAUSE NO. 3:11-cv-169-CAN |
| GREENCROFT GOSHEN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

On June 22, 2010, Defendant, Greencroft Goshen, Inc., a continuing care retirement

community, fired Plaintiff, Judith DeWalt.  In her complaint, DeWalt alleged that Greencroft

violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C.§ 201 *et seq.,* by firing her in

retaliation for questioning the exempt status of her marketing associate position.  DeWalt also

alleged that Greencroft incorrectly classified her position as exempt from the overtime pay

requirements of the FLSA resulting in insufficient compensation throughout her tenure at

Greencroft.  Because DeWalt has failed to produce evidence upon which a fact finder could

reasonably conclude that Greencroft misclassified her position, improperly compensated her, or

retaliated against her for questioning the exempt status of her position, the Court **GRANTS**

Greencroft's motion for summary judgment and **DENIES AS MOOT** Greencroft's motion to

correct this Court's order setting a trial date.

**I.    PROCEDURE**

On April 21, 2011, DeWalt filed a complaint against Greencroft in this Court alleging

violations of the FLSA including (1) misclassifying her position as exempt, (2) failing to pay her

overtime, (3) making improper deductions from her pay, and (4) firing her in retaliation for

complaining that her position was misclassified and that her pay was improperly reduced. On May 16, 2012, Greencroft filed a motion for summary judgment as to all claims. On July 19, 2012, DeWalt filed a response. On August 10, 2012, Greencroft filed a reply. Because DeWalt conceded that Greencroft's pay deductions were proper, the Court will not discuss that issue in this opinion. *See* Doc. No. 34 at 3; Doc. No. 37 at 1. In addition, Greencroft filed a motion on October 18, 2012, to correct this Court's order setting a trial date. The Court issues the following opinion and order pursuant to the consent of the parties and 28 U.S.C. § 636(c).

## II.   FACTS

The following facts are primarily not in dispute. Where the facts are in dispute, this Court has determined that the disputes are either not material or has chosen to address such disputes in the Court's substantive analysis of the issues.

From January 4, 2010, until June 22, 2010, Judith DeWalt worked as a marketing associate for Greencroft Goshen, Inc. ("Greencroft"), a retirement community in Goshen, Indiana. DeWalt's supervisor was Cynthia Pergrem, Greencroft's director of marketing. Pergrem reported to Jennifer Hayes, vice president of Greencroft Retirement Communities, Inc. ("GRC"), Greencroft's parent corporation, who oversaw marketing and development at GRC's five continuing care retirement community campuses in Indiana and Ohio. Kathy Brewton was GRC's vice president for human resources.

DeWalt and Pergrem constituted Greencroft's entire marketing department. Pergrem hired DeWalt in December 2009 after an interview where they discussed the marketing associate's job duties. Specifically, Pergrem told DeWalt that the job was full-time and required regular business hours during the week plus some additional morning, evening, and weekend

2

hours.  Pergrem also told DeWalt that the job was a salaried, exempt position.  At the interview

and again at her 90-day review in April 2010, DeWalt signed a job description consistent with

the discussion of duties at the interview.

As the marketing associate, DeWalt primarily promoted Greencroft to prospective

residents and their families and secured commitments from them to move into Greencroft.  To

accomplish this, she communicated with prospects over time to learn their needs and provide

them with pertinent information about Greencroft's living options, personal services, and

financial requirements.  She also coordinated prospect visits and tours.  Once a prospect

committed to move into Greencroft, DeWalt assisted with the paperwork and worked with other

Greencroft departments to facilitate the move.

Secondarily, DeWalt promoted Greencroft to the public.  During her six-month tenure,

she helped Pergrem plan two open houses as well as a dinner and speaker for prospects.  They

were planning future events and brainstorming for new ways to reach prospects.  In addition,

DeWalt initiated relationships with doctors identified by Pergrem as potential referral sources.

When making visits to doctors' offices, she introduced herself as Greencroft's marketing

representative and left gift baskets to encourage referrals.  Had she remained at Greencroft,

DeWalt would have been expected to expand those relationships and reach out to other local

professionals who could generate referrals.

DeWalt enjoyed her job and received compliments from Pergrem and other Greencroft

employees.  Due to some personal matters, however, DeWalt sought and received approval from

Pergrem to be absent a total of eleven days during her six-month tenure before qualifying to use

any paid time off ("PTO") under Greencroft's leave policy.  Greencroft docked DeWalt's pay for

those eleven absences as was standard under Greencroft's policy for exempt employees.

Despite her premature absences, DeWalt received only one disciplinary write-up based on a single unanticipated absence. However, Pergrem addressed the absences with DeWalt in April 2010 and June 2010, reminding her that her position was full-time and required good attendance. Then, on June 7, 2010, DeWalt asked Pergrem if she could go part-time or take some time off on Monday and Tuesday afternoons so she could transport her children to tutoring sessions over the summer. Pergrem reiterated that the marketing associate position was full-time and a part-time schedule would not be feasible. As a result, DeWalt told Pergrem that she would need to decide if she could continue working at Greencroft. A couple days later, DeWalt e-mailed Pergrem suggesting other alternative work schedules, including some off-site work hours. Pergrem rejected those alternatives because the position was full-time and the work had to be completed on-site.

On June 15, 2010, Pergrem and Hayes met with DeWalt to discuss Greencroft's expectations of her as its marketing associate. Hayes explained that DeWalt's absences, although approved, affected the productivity of the marketing department. Therefore, DeWalt was not meeting GRC's expectations for its full-time marketing employees. Pergrem and Hayes ended the meeting by offering DeWalt the chance to take off on Monday and Tuesday afternoons through the summer, but requiring her to work on Saturdays. They asked DeWalt to accept the offer or resign by the next day.

The next day, before responding to the pending offer, DeWalt asked Pergrem if her job should have been classified as hourly rather than salaried based on her job duties. Pergrem informed her that her job was salaried. DeWalt then found Brewton, GRC's vice president for

human resources, at a staff picnic and asked about her classification. Brewton told DeWalt that she thought she was an hourly employee. DeWalt told Brewton that she was being paid as a salaried, exempt employee. She also told Brewton that she would not accept the pending offer or resign, and that Pergrem would have to fire her. Later that day, Brewton reviewed her records and determined that DeWalt's position was exempt under the FLSA. DeWalt did not return to work until June 22, 2010, after taking three days of upaid leave that had been approved by Pergrem.

On June 22nd, Brewton, Hayes, Pergrem, and DeWalt met to address the impasse over DeWalt's summer work schedule. Pergrem opened the meeting by summarizing the current status of DeWalt's request. DeWalt immediately redirected the discussion to the topic of the exemption classification of her position. Brewton then informed DeWalt that given its marketing aspects, Greencroft had determined that the marketing associate position met the requirements for an exemption. The conversation returned to the standing offer.

DeWalt refused to agree to work every Saturday. Pergrem suggested that DeWalt resign if she could not commit to working a full-time schedule. DeWalt refused the accommodation and refused to resign telling Pergrem she would have to fire her. At that point, Pergrem fired DeWalt. The next day, June 23, 2010, DeWalt sent an e-mail to Brewton and Hayes informing them that Pergrem had approved all her absences and still "docked" her salary for those absences.

III. ANALYSIS

A. Summary Judgment Standard

Summary judgment is proper where the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc*., 245 F.3d 916, 922 (7th Cir. 2001).  In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the nonmoving party as well to draw all reasonable and justifiable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).  To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings.  Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial.  *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).  Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

>    **B.**    **Greencroft properly classified DeWalt's marketing associate position as administratively exempt from the overtime provisions of the FLSA.**

Congress enacted the FLSA to eliminate labor conditions that were detrimental to the health, efficiency, and general well-being of workers.  29 U.S.C. § 202.  Under the FLSA, employers may not require employees to work in excess of forty hours per week without compensation at one-and-one-half time the normal rate of pay.  29 U.S.C. § 207(a)(1).  However, this overtime provision does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).

An employee is classified as administratively exempt if: (1) she is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week . . .; (2) [her] primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [her] primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The employer bears the burden of establishing whether an employee meets these three requirements and "falls within the FLSA's administrative exemption." *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 869 (7th Cir. 2008) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974)). Determining the duties of a particular employee's position is a question of fact. *Id.* (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). However, ascertaining whether a particular employee's position is properly classified as exempt or non-exempt is a question of law. *Id.*

DeWalt alleges that Greencroft improperly classified her marketing associate position as administratively exempt from the overtime provisions of FLSA. The parties agree on what DeWalt's duties as Greencroft's marketing associate included. Therefore, there is no genuine issue of material fact to be resolved in this case. The parties disagree, however, as to whether those duties satisfy the primary duty requirements of the administrative exemption. Because the parties agree that Greencroft paid DeWalt a salary at the rate of $590.80 per week without any overtime payments, Greencroft has established that DeWalt's position meets the salary basis test—the first prong of the administrative exemption test. For the reasons stated below, the Court finds that Greencroft also established the second and third prongs of the administrative exemption test. Therefore, Greencroft properly classified DeWalt as an administratively exempt

employee.

### 1. DeWalt's primary duty was the performance of work directly related to management or general business operations of Greencroft.

To qualify for the administrative exemption under the FLSA, an employee's primary job duties must be exempt work. 29 C.F.R. § 541.700(a). Job title alone does not establish the exempt status of an employee. *Id.* at §541.2. Therefore, to determine whether an administrative exemption exists for a particular employee, the court must conduct a "thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-Larose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (citing *Roe-Midgett*, 512 F.3d at 870); *see also* 29 C.F.R. § 541.2 (explaining that the salary and duties of the particular employee must meet the exemption requirements). A "primary duty" is "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). It can be useful to assess the amount of time an employee spends on exempt tasks when determining an employee's primary duties. *Id.* at § 541.700(b). However, the

> [d]etermination of an employee's primary duty must be based on all the facts in a particular case, with major emphasis on the character of employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* at § 541.700(a). Therefore, the primary duties of some employees may be exempt even when less than fifty percent of their work is exempt. *Id.*

"To qualify for an administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the

employer or the employer's customers." *Id.* at § 541.201(a). Such job duties are "directly related to assisting with the running or servicing of the business" and include promoting sales and representing the company rather than tasks that simply carry out the daily affairs of the employer. *Id.*;Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,138 (Apr. 23, 2004) (hereinafter "Defining and Delimiting the Exemptions"). Employees who sell a product in a retail or service establishment are not engaged in work that meets this requirement. *Id.*; *see also Reiseck v. Universal Commc'ns. of Miami, Inc.*, 591 F.3d 101, 107 (2d Cir. 2010); *Martin v. Cooper Electric Supply Co.*, 940 F.2d 896, 904–05 (3d Cir. 1991). Among the many job duties specifically identified as directly related to management or general business operations are advertising, marketing, and public relations. *Id.* at § 541.201(b). On more than one occasion, the Seventh Circuit has held that the primary duties of marketing-related jobs satisfy the "directly related" requirement. *See Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560 , 574, 577 (7th Cir. 2012) (pharmaceutical sales representatives); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 871, 873 (7th Cir. 2008) (material damage appraisers assisting insurance company in processing claims); *Haywood v. N. Amer. Van Lines, Inc.*, 121 F.3d 1066, 1068, 1072 (7th Cir. 1997) (moving company's customer service representative).

Despite the regulations, determining exactly where the line is between administrative and pure sales jobs is not clear for every position and must be determined on a case-by-case basis. In this case, DeWalt contends she was not involved in the activities of running Greencroft's business or in determining the course of the business. DeWalt emphasized that she had no hiring, firing, or supervisory authority. Her distinction is irrelevant because those activities only

apply to the classification of employees under the executive exemption, not the administrative exemption. *See* 29 C.F.R. § 541.100(a). DeWalt also argued that she played no role in establishing or enforcing company policies; she did not engage in negotiations with prospective residents or referral sources; and she had no input as to the company's marketing goals or plan. She asserted that 80% of her duties as a marketing associate were non-exempt.

DeWalt accepted that 20% of her duties were exempt marketing duties including assisting with the preparation of Greencroft special events and dealing with referral sources within the community. She stated, however, that the other 80% of her job duties simply amounted to selling the Greencroft "product" of housing and personal services in a continuing care retirement community to individual prospects. DeWalt attempts to squeeze into the salesperson category. She argued that her sales duties merely carried out the day to day affairs of the marketing department by comparing herself to a shoe salesperson who helps customers choose the right size and style in order to facilitate the sale. Yet it is DeWalt's argument that is the uncomfortable fit, an argument that simply does not fit the facts of this case.

DeWalt explained that 40% of her sales duties was communicating with prospects and gathering information from them. The other 40% of her time was spent entering that information into the computer so that other Greencroft employees could decide whether the prospect was eligible to move into Greencroft. DeWalt appears to be arguing that 80% of her tasks were simply routine tasks that did not assist Greencroft in running or servicing its business.

Greencroft views the 40% of DeWalt's work that included communicating with prospects differently. Greencroft argued that DeWalt's communications with prospects created first impressions of Greencroft and allowed her to secure commitments that generated the revenue

necessary for Greencroft to achieve its business goal of providing a full continuum of care services for seniors. Greencroft refuted DeWalt's salesperson analogy emphasizing the extended nature of a marketing associate's relationship with prospective residents and families in light of the long decision-making cycle that typifies the continuing care industry. Greencroft also highlighted the personal nature of a marketing associate's relationship with prospects, whose unique needs drive the decision to move into Greencroft. Accordingly, Greencroft concluded that DeWalt's communications with prospective residents constituted office or non-manual work directly related its management or general business operations. The Court agrees.

Greencroft's primary business was not sales. As a non-profit entity, its primary business goal was providing housing, social outlets, and personal services to senior citizens using a continuing care model. Therefore, even if DeWalt's sales tasks consumed more than 50% of her work time, her primary duty was still related to Greencroft's management and directly related to its business operations. *See Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 540–41 (7th Cir. 1999) (stating that an employee who spends the majority of his time engaged in routine tasks may still qualify as an administratively exempt employee because "[a]n 'employee's primary duty is that which is of principal importance to the employer, rather than collateral tasks which may take up more than fifty percent of his or her time.'" (quoting *Reich v. Wyoming*, 993 F.2d 739, 742 (10th Cir. 1993))).

DeWalt cited to *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009), to support the proposition that an administratively exempt employee does not merely participate in the day-to-day activities of the employer's affairs. The specific analysis of the bank's underwriter position in *Davis*, however, does not help DeWalt's case. In *Davis*, the plaintiff

underwriter's primary duty was selling loan products as dictated by the company's predetermined credit policy. *Id.* at 534. The underwriter's tasks did not involve advising customers as to which loan product best suited their needs and abilities. *Id.* The court found that the underwriter's primary duties constituted sales rather than administrative work. *Id.* at 535. The court reasoned that the underwriter's role was functional not conceptual, especially because the underwriter simply applied the credit policy. *Id.*

Unlike the underwriter in *Davis*, however, DeWalt's sales activities involved listening to and advising prospective residents as to what Greencroft services best suited their needs. DeWalt's duties were broader than simple sales like *Davis*'s bank underwriter or even a shoe salesman. FLSA regulations provide that:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b); *see also Blanchar v. Standard Ins. Co.*, 2012 WL 2458639, at *5–7 (S.D. Ind. June 27, 2012) (finding that Standard's Special Markets Director position satisfied the second prong of the administrative exemption test). In her communications with prospective residents, DeWalt was not supervised. She collected a large amount of information, including financial information, and analyzed that information in order to determine which Greencroft services were best suited to the prospect. She then made recommendations to prospects, which often required delicate conversations because prospective residents and their families were not

always prepared to accept the realities of the prospect's needs.

In addition, DeWalt's job required her to develop long-term relationships with prospective residents because of the extended decision-making cycle. While those relationships may have facilitated individual sales, they also promoted Greencroft's product to the public. DeWalt's relationships were not solely with the prospective resident. The nature of the continuing care product led to relationships with families, which created opportunities for referrals. Thus, DeWalt's primary duty was not merely individual sales. Greencroft has established that DeWalt's primary duty was office or non-manual work directly related to the management or general business operations of Greencroft.

### 2. DeWalt's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.

Having satisfied the salary basis test and the "directly related" prong, Greencroft also established the third prong of the administrative exemption test. DeWalt's primary duty included "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). Determining whether a particular employee uses the discretion and independent judgment necessary to establish an administrative exemption requires an examination of all the facts related to the position in the unique setting of that particular employer. *Id.* at § 541.202(b). Generally, exercising discretion and independent judgment requires an employee to compare possible courses of conduct, evaluate them, and decide which course to follow as the result of her considerations. *Id.* at § 541.202(a). Some factors to consider include, but are not limited to:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the

13

employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* at § 541.202(b). This list, however, is exemplary and non-exhaustive. *Schaefer-LaRose*, 679 F.3d at 582. The preamble to the regulations also mentions other factors such as the use of personalized communication techniques, responsibility for assessing customer needs, being the primary contact for the employer to the public or customers, advertising and promotion work, and coordination with other internal and external entities on behalf of the employer. Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22,144. Despite such a lengthy list of factors, courts must still evaluate the facts related to each particular position in the unique setting of a particular employer or industry using these factors as a guide rather than as a checklist. *Schaefer-LaRose*, 679 F.3d at 582.

In this case, Greencroft relied heavily on DeWalt's work with prospective residents to establish that her job included the exercise of discretion and independent judgment on matters of significance. In particular, Greencroft emphasized that DeWalt used personalized communication techniques to assess the needs and preferences of prospects and to keep prospects engaged during the decision-making cycle, which could last for years. Greencroft also pointed to DeWalt's responsibility to keep occupancy up to levels designated by the Greencroft board of directors, which required her to coordinate with other Greencroft departments as she

14

balanced Greencroft's business needs with those of the prospects.  In addition, Greencroft explained that DeWalt typically managed about fifty prospects.  That load often required her to work additional hours on evenings or weekends to accommodate the scheduling needs of the prospects.

In her deposition, DeWalt acknowledged that her contact with prospects, and referral sources as well, required such personalized communication.  Moreover, she did not claim that she was supervised in her communications with prospects or in managing her off-hour work schedule. Therefore, DeWalt's personalized, unsupervised communications show that she exercised discretion and independent judgment in her job.  Furthermore, her decisions on how to guide each prospect to choose and transition into Greencroft directly affected occupancy rates, a matter of significance as identified by the Greencroft board.

Nonetheless, DeWalt claimed that she did not exercise discretion and independent judgment in her job as Greencroft's marketing associate.  She suggested that her marketing associate position failed to satisfy most of the factors in 29 C.F.R. § 541.202(b).  She then focused her argument around two parts of the FLSA regulations:

> (c)  The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. . . .
> . . . .
> (e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. . . . The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work.

*Id.* at § 541.202.

As to her freedom from immediate direction or supervision, DeWalt admitted in her

deposition that no one accompanied her on visits with prospects.  Moreover, no one scripted her

for any of those visits.  She argued, however, that her supervisor controlled everything about her

job leaving no room for discretion or independent judgment.  Specifically, DeWalt emphasized

that she did not determine  health, psychological, or financial eligibility for any prospects on

behalf of Greencroft.  The only information she was allowed to give to prospects or referral

sources was a predetermined marketing packet provided by Greencroft.  Her telemarketing and

outreach efforts were similarly limited to individuals on lists given to her by Greencroft without

any input from her.  In addition, she was required to include gifts in baskets for referral sources

that were predetermined by Greencroft.  On a broader scale, DeWalt argued that she had no

power to negotiate with prospects to close a sale, to contribute to marketing plans, or to resolve

complaints.  She asserted that she had no input on the special marketing events she worked on

with Pergrem.  She simply followed Pergrem's instructions on preparing invitations, tracking

reservations, and sometimes obtaining balloons.

DeWalt's analysis simply ignores, however, the discretion and independent judgment

involved in her personal communications with prospects and referral sources that she

acknowledged in her deposition.  In her argument, DeWalt went so far as to suggest that she had

no control over the content of prospect tours because she only took them to the places in the

facility that they asked to see.  Whiles DeWalt's tours may have been based on the unique needs

and interests of each prospect, DeWalt determined what parts of the facility matched those needs

and then shared pertinent personalized information about those features.  On the other hand, it

makes sense that Greencroft would craft messaging for every aspect of their services and that it

would require marketing associates to present those messages consistently to prospects and the

public to build brand recognition.  Such control of the marketing messages and audiences did not diminish the discretion and independent judgment DeWalt used in her communications with prospects and referral sources.  *See* 29 C.F.R. § 541.202(c) ([T]he term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and complete absence of review.").

As to the clerical aspects of her work, DeWalt argued that she spent significant time recording and entering prospect data into the computer and that those repetitive tasks were non-exempt duties.  "Just because an employee may spend a significant portion of his time engaged in ministerial or routine tasks does not necessarily prevent the application of the administrative exemption."  *Schaefer-LaRose*, 679 F.3d at 582 (quoting *Piscione*, 171 F.3d at 538).  Like the pharmaceutical sales representatives in *Schaefer-LaRose*, DeWalt was required to keep extensive records regarding prospective residents and referral sources.  DeWalt's record-keeping, however, merely supported her core activity of working to personalize the Greencroft experience for prospective residents and securing their commitment.  Similarly, DeWalt's preparation of contracts using Greencroft's standard form and fixed financial formula supported her personalized work with each prospect.  Therefore, her clerical work did not negate the discretion and independent judgment she exercised when working with prospects.

### 3. Brewton's June 16th statement about the classification of DeWalt's position and Greencroft's time clock requirements are irrelevant to the determination of DeWalt's administratively exempt status.

In attacking Greencroft's classification of DeWalt's position, DeWalt also spent considerable time developing facts unrelated to the administrative exemption test set forth in 29 C.F.R. § 541.200(a).  Specifically, DeWalt argued that Brewton admitted that DeWalt was an

hourly employee and should have been classified as such. DeWalt inferred from Brewton's statement that Greencroft intentionally misclassified DeWalt's position. DeWalt also inferred intentional misclassification from Greencroft's requirement that DeWalt use a time clock to track her work hours and from its insistence that she clock out for lunch regardless of whether she took a lunch break or not.

Greencroft admitted that on June 16, 2010, Brewton told DeWalt that she was an hourly employee. However, it reasonably explained that the statement was a mistake because it was made when Brewton was away from her office at a staff picnic. As appealing as these facts may be to either party, they are irrelevant to the administrative exemption analysis of DeWalt's position. An employer's statement does not determine an employee's proper classification—the compensation basis and the primary duties of the employee do. *See* 29 C.F.R. § 541.200(a).

Similarly, DeWalt's reliance on the Greencroft time clock policies is also misplaced. Employers may require exempt employees to record and track work hours and to work a specified schedule. D.O.L. W.H.D. Op. Ltr., 2006 WL 940662 (Mar. 10, 2006) (citing the preamble to the final rule interpreting FLSA exemptions). In addition, an employer's intent has no effect on the classification determination. As a result, neither DeWalt's arguments or Greencroft's rebuttals on any of these points are relevant to the legal determination of whether DeWalt's job duties qualified for an administrative exemption from FLSA's overtime requirement.

Therefore, for the reasons stated above, Greencroft established that DeWalt's marketing associate position satisfied the three prongs of the administrative exemption test set forth in 29 C.F.R. § 541.200(a). DeWalt was properly classified as administratively exempt from the

overtime requirements of the FLSA.

**C.    Greencroft did not retaliate against DeWalt for engaging in activity protected under the FLSA when it terminated her employment as a marketing associate.**

Under the FLSA, it is unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3).   In order to prevail on a claim of retaliation under the FLSA, a plaintiff must either offer direct evidence of discrimination, or proceed under the burden-shifting method set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) for Title VII cases.  *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 810 (7th Cir. 2005).  Whether proceeding under the direct or indirect method, plaintiff must establish (1) that plaintiff participated in activity protected under FLSA; (2) that plaintiff suffered an adverse employment action; and (3) that there was a causal connection between plaintiff's protected activity and the adverse action.  *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (outlining elements in a Title VII retaliation claim).

**1.    DeWalt engaged in protected activity when she orally inquired about her exemption status on three occasions.**

Greencroft questioned whether DeWalt's oral inquiries constituted activity protected under the FLSA.  The parties agreed that DeWalt never filed a written complaint asserting that her position was misclassified.  They also agreed that DeWalt orally asked Greencroft employees about her exempt status on three occasions.  DeWalt first asked Pergrem whether she was an hourly or salaried employee on June 16, 2010 [1].  Pergrem told her she was salaried and exempt.

_____

[1] In its brief, Greencroft suggested that confusion about the date when DeWalt asked Pergrem, and later Brewton, about her exempt status for the first time may exist.  Greencroft cited to an apparent contradiction between DeWalt's deposition testimony, her affidavit attached to her summary judgment brief, and a footnote in that brief.

Later that same day, DeWalt asked Brewton the same question at a staff picnic.  Brewton told

DeWalt that she thought she was an hourly employee.  On June 22, 2010, DeWalt asked

Pergrem, Brewton, and Hayes about her status during a joint meeting convened to discuss a

summer work schedule change previously offered to DeWalt by Greencroft.  Brewton responded

informing DeWalt of two things: (1) that her June 16th statement was made in error because she

was away from her desk and unable to consult the proper records; and (2) that DeWalt was a

salaried, exempt employee.  DeWalt responded by stating that she had done some research on the

FLSA and believed that her position was hourly and non-exempt.[2]

The Supreme Court addressed whether an oral complaint constitutes statutorily protected

activity under FLSA in *Kasten v. Saint-Gobain Performance Plastics Corp.*, _____ U.S. _____,

131 S. Ct. 1325, 1334–35, 179 L. Ed. 2d 379 (2011).  According to *Kasten*, an oral complaint

could support a retaliation claim if the employer

> has been given fair notice that a grievance has been lodged and does, or should,
> reasonably understand the matter as part of its business concerns. . . . To fall
> within the scope of the antiretaliation provision, a complaint must be sufficiently
> clear and detailed for a reasonable employer to understand it, in light of both
> content and context, as an assertion of rights protected by the statute and a call for
> protection.

Under the criteria in *Kasten*, DeWalt's questions about her status to Pergrem, Brewton, and

Hayes constituted a valid oral complaint.  All three of DeWalt's inquiries clearly indicated

DeWalt's concern about misclassification.  And even if Pergrem did not understand DeWalt's

first inquiry to be a grievance calling for protection under the FLSA, the cumulative effect of the

---

Because the analysis is the same using any of the suggested dates, the Court accepts Greencroft's more consistent
date of June 16th as the date for these conversations.

[2]Taking the facts in the light most favorable to the non-movant, the Court assumes that DeWalt made this
statement as presented in her summary judgment brief despite the lack of corroboration in Greencroft's brief.

three inquiries and the surrounding exchanges was sufficient for Pergrem, Brewton, and Hayes to reasonably understand DeWalt's interest in changing her exemption to comply with the FLSA.

DeWalt also suggested that she engaged in protected activity by questioning whether improper deductions were made to her paychecks.  However, DeWalt first questioned the deductions on June 23, 2010, the day after she was terminated.  Without knowledge of DeWalt's concern about improper pay deductions before termination, Greencroft did not have sufficient notice of DeWalt's FLSA complaint to support a retaliation claim.  Therefore, DeWalt successfully established that her oral complaints about her classification status constituted protected activity under the FLSA.  Her complaint about pay deductions did not.

### 2. Greencroft did not terminate DeWalt because she inquired about her administrative exemption status under the FLSA.

Because both parties agree that DeWalt suffered an adverse employment action when she was fired, DeWalt's retaliation claim thus turns on whether her protected activity caused her termination.  And it is here that DeWalt's retaliation claim fails.  To establish the necessary causal connection under the direct method, a plaintiff must present substantial direct or circumstantial evidence "that the employer was motivated at least in part by the plaintiff's protected conduct."  *Hernandez v. City Wide Insulation of Madison, Inc.*, 508 F. Supp. 2d 682, 688 (E.D. Wis. 2007); *see also Sylvester v. SOS Children's Villages Ill.*, 453 F.3d 900, 903 (7th Cir. 2006) (explaining that circumstantial evidence, such as ambiguous statements, suspicious timing, and discrimination against other employees, may establish a "convincing mosaic of discrimination against the plaintiff").  If the plaintiff provides uncontradicted evidence, she is entitled to summary judgment.   *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  If the defendant contradicts the plaintiff's evidence, "the case must be tried

unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive." *Id.* If the defendant thus succeeds in showing that the plaintiff was not harmed by retaliation, the defendant is entitled to summary judgment. *Id.* Because DeWalt did not make any arguments under the *McDonnell Douglas* burden-shifting method, the Court will only address the direct method.

DeWalt made three arguments to support her claim that Greencroft fired her because she questioned the classification of her position. DeWalt primarily argued that there is suspicious timing between her inquiries and her termination. DeWalt then contested the veracity of Greencroft's assertions that her work performance and attendance caused her termination. DeWalt contended that she was a good employee with only one disciplinary write-up throughout her tenure and that Greencroft approved all the requests for time-off that she made.

"[F]or there to be a telling temporal sequence, the employer's adverse action should follow fairly soon after the employee's protected expression." *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 613 (7th Cir. 2001). "[T]iming may offer a clue to causation (or its absence) when an employee charges retaliation: a short gap may suggest a causal link, while a long one undercuts an inference of causation." *McGuire v. City of Springfield*, 280 F.3d 794, 796 (7th Cir. 2002). However, timing is just a clue and does not always succeed in implying causation. In this case, DeWalt relied upon the fact that there was not a long delay between DeWalt's complaints on June 16th and June 22nd and her termination on June 22nd to establish the inference that Greencroft retaliated against her. In response, Greencroft argued that it would have fired DeWalt despite the complaints because she refused to work the full-time schedule it defined for

her position as a marketing associate.

Greencroft presented multiple undisputed facts that successfully support its assertion. DeWalt knew about the exempt status of her position since her interview in December 2009, and it was reiterated to her with every paycheck she received without overtime pay throughout her six-month tenure. DeWalt's questions about her exempt status only started as part of a dialogue between DeWalt and Greencroft about changing her summer work schedule to accommodate her family schedule. DeWalt first requested a revised summer work schedule on June 7th in a conversation with Pergrem. Pergrem denied DeWalt's request. DeWalt presented an alternative to Pergrem on June 10th in the hope of finding an option that would satisfy her obligation as Greencroft's marketing associate and her obligation to her family. Pergrem once again rejected DeWalt's proposal explaining that she was needed full-time at Greencroft. In response to DeWalt's interest in flexibility and with an interest in accommodating her request, Pergrem and Hayes met with DeWalt on June 15th and presented their proposed revised summer schedule to her. They asked DeWalt to accept the offer or resign by the next day. On the next day, June 16th, DeWalt asked Pergrem, for the first time, whether her position was properly classified.

Unsatisfied with Pergrem's response that the position was salaried, DeWalt immediately located Brewton at a staff picnic and asked her the same question. However, Brewton responded differently telling DeWalt that she should be an hourly employee. Brewton realized that afternoon, after reviewing company records that she had not been able to access while talking to DeWalt, that she made a mistake in her answer to DeWalt and that her position was properly classified as salaried and exempt. Even without knowledge of Brewton's error, however, DeWalt did not tell Pergrem whether she accepted Pergrem's and Hayes's proposed work

schedule on June 16th as required.

DeWalt was then absent from work from June 17 through June 21 accompanying her son on a trip. On June 22, 2010, DeWalt returned to work and met with Pergrem, Brewton, and Hayes to resolve the summer schedule issue. In the middle of the discussion about the summer schedule, DeWalt asked again about her status. Brewton then informed DeWalt of her error and reiterated that the position was exempt. The discussion returned to the scheduling issue. DeWalt refused to accept the June 15th offer and told Pergrem that she would not resign. DeWalt even stated three times that Pergrem would have to fire her. Greencroft then did so.

DeWalt does not dispute that Greencroft had the right to dictate her work schedule regardless of her exempt status. And despite DeWalt's suggestion that Greencroft was dissatisfied with DeWalt's work performance, Greencroft does not dispute that DeWalt loved her job and received several compliments from Pergrem and other Greencroft employees. In fact, Greencroft went to substantial lengths to keep DeWalt by approving her requests for excessive absences and working to accommodate her summer schedule. Nonetheless, Greencroft was concerned about DeWalt's attendance.

No reasonable fact finder could conclude that DeWalt's termination was caused by exercising protected activity. A fair conclusion from the record presented is that DeWalt was unwilling to devote the time that her employer felt was necessary to adequately perform the required duties of her position. Although Greencroft was willing to make some accommodations, DeWalt was unwilling to accept them. Rather, DeWalt was attempting to dictate to her employer the terms of her employment. In short, DeWalt's arguments over misclassification and retailiation are without any merit. When faced with an employer who

would not meet her demands for further accommodation, she replied, "Then you will have to fire me." That Greencroft did should not have surprised DeWalt, and nor did it violate the law.

## IV.  CONCLUSION

Because the parties agree that there are no disputes as to any material facts, summary judgment is appropriate in this case. And because Greencroft established that DeWalt was properly classified as exempt under the FLSA and DeWalt has failed to produce sufficient evidence upon which a fact-finder could reasonably conclude that her termination was in retaliation for her engaging in protected activity under the FLSA, the Court now **GRANTS** Greencroft's motion for summary judgment. [Doc. No. 25]. The clerk is instructed to enter judgment for Greencroft on all claims.

Because no claims remain in this case, Greencroft's motion seeking to correct the record to reflect that this matter is set for a bench trial rather than a jury trial on December 11, 2012, is **DENIED AS MOOT**. [Doc. No. 38].

**SO ORDERED.**

Dated this 30th day of October, 2012.

s/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge